UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE BUCHWALD
Civ.

MAYFLOWER PARTNERS, L.P., formerly
known as Biomol International, LP,

Plaintiff,

10 CIV 7339

**COMPLAINT**

- against -

ENZO BIOCHEM, INC. and ENZO LIFE
SCIENCES, INC.,

Defendants.

------------------------------------------------------------X

RECEIVED

SEP 23 2010

U.S.D.C. S.D. N.Y.

Plaintiff, Mayflower Partners, L.P., formerly known as Biomol International, L.P.

("Mayflower") by its counsel, Tobias Law Firm, P.C., as and for its Complaint against

defendants Enzo Biochem, Inc. ("Enzo-Bio") and Enzo Life Sciences, Inc. ("Enzo-Life")

respectfully alleges:

## NATURE OF THE ACTION

1.       This action arises from a Stock and Asset Purchase Agreement dated as of May 8,

2008 (the "Agreement") under which Enzo-Bio and Enzo-Life, its wholly-owned subsidiary,

purchased Mayflower's business of researching, developing, manufacturing, distributing,

marketing and selling specialty immunological and biochemical reagents for use in life science

research (the "Business"). As part of the transaction reflected in the Agreement, Mayflower sold

the stock it owned in Affiniti Limited ("Affiniti"), which in turn owned all the stock of Affiniti

Research Products Limited ("Affiniti Research"), to Enzo-Life's wholly-owned subsidiary,

Axxora (U.K.) Ltd. (the "Buyer's U.K. Affiliate").

2.      Also, as part of the transaction reflected in the Agreement, Mayflower; its general partner, Biofiniti, LLC ("Biofiniti"); its special limited partner, Mamhead Holding Co., LLC ("Mamhead"); and, its individual limited partners, Robert E. Zipkin, PhD. ("Zipkin"), Ira M. Taffer, PhD. ("Taffer"), Paul W. Sheppard, PhD. ("Sheppard") and Ian M. Varndell, PhD. ("Varndell"), sold their rights, title and interests in and to the assets of the Business, other than the assets of Affiniti and Affiniti Research (together the "Affiniti Companies") to Biomol International, Inc., a newly created, wholly owned subsidiary of Enzo-Life (the "Buyer's U.S. Affiliate").

3.      Under the Agreement, Enzo-Bio and Enzo-Life (together, "Enzo") conditionally agreed to pay two earn-out payments of $2.5 million each (together, the "Earn-Out Payments"): one for the period May 1, 2008 to and including April 30, 2009 (the "First Earn-Out Period"); and one for the period May 1, 2009 to and including April 30, 2010 (the "Second Earn-Out Period").

4.      Pursuant to the Agreement, during the First Earn-Out Period and the Second Earn-Out Period (together, the "Earn-Out Periods"), Enzo agreed to operate the Business in good faith and not to take any actions the primary purpose of which was to avoid making the Earn-Out Payments to Mayflower (the "Good Faith and Primary Purpose Issues").

5.      During the Second Earn-Out Period, Enzo did not operate the Business in good faith and took actions the primary purpose of which were to avoid making the $2.5 million Earn-Out Payment for the Second Earn-Out Period (the "Second Earn-Out Period Payment").

6.      For Mayflower to be entitled to the Second Earn-Out Payment, "Adjusted Business Net Sales" as defined in Section 2.6(e)(ii) of the Agreement, for the Second Earn-Out Period were required to exceed $12,067,701.00, and the "Business EBITDA," as defined in

2

Section 2.6(e)(iii) of the Agreement, had to exceed $1,900,000.00. Enzo-Life reported to Mayflower that for the Second Earn-Out Period, the Business EBITDA was $2,062,342.00, but that the Adjusted Business Net Sales were only $11,833,558.00. A substantial component of Adjusted Business Net Sales are the gross revenues of the Buyer's U.S. Affiliate and the Buyer's U.K. Affiliate.

7.      Section 2.6(c) of the Agreement provides that an independent auditor of recognized national standing (the "Accounting Firm") is to determine disagreements between Enzo-Life and Mayflower as to their calculation of Adjusted Business Net Sales and Business EBIDTA (the "Accounting Firm Determination Procedure"). However, the Agreement limits the scope of the Accounting Firm's determinations to whether Enzo-Life's calculation was derived from Enzo's books and records, in conformity with GAAP, consistent with the consolidated financial statements included in Enzo-Bio's SEC Reports, and whether there were any mathematical errors in the calculation of the Adjusted Business Net Sales, Business Net Sales and/or Business EBIDTA for the Earn-Out Period in question.

8.      This calculation of the revenues of Buyer' U.S. Affiliate and Buyer's U.K. Affiliate are crucial to the Accounting Firm's determination of Adjusted Business Net Sales and will determine if the Second Earn-Out Period Payment is due and payable to Mayflower. The parties have agreed that the Accounting Firm does not have the authority to determine if Enzo has breached the Good Faith and Primary Purpose Issues. Thus, this Court's declarations with respect to the Good Faith and Primary Purpose Issues will be used by the Accounting Firm in the Accounting Firm Determination Procedure to determine the Adjusted Business Net Sales and Business Net Sales for the Second Earn-Out Period, and therefore whether the $2.5 million Second Earn-Out Period Payment is due and payable from Enzo to Mayflower.

## PARTIES

9.    Mayflower is a limited partnership duly organized pursuant to the laws of the Commonwealth of Pennsylvania, having its principal place of business in Montgomery County, State of Pennsylvania.

10.    Biofiniti, Mayflower's general partner, is a Pennsylvania limited liability company, with a principal place of business in Montgomery County, Commonwealth of Pennsylvania.

11.    Biomol Research (now known as Michmar Inc.), a special limited partner in Mayflower, is a Pennsylvania corporation, with a principal place of business in Montgomery County, Commonwealth of Pennsylvania.

12.    Mamhead, a special limited partner in Mayflower, is a Delaware limited liability company, with a principal place of business in Montgomery County, Commonwealth of Pennsylvania.

13.    Zipkin is an individual limited partner in Mayflower, and a resident of Montgomery County, Commonwealth of Pennsylvania.

14.    Taffer is an individual limited partner in Mayflower, and a resident of Montgomery County, Commonwealth of Pennsylvania.

15.    Sheppard is an individual limited partner of Mayflower, and a citizen of and resident in the United Kingdom.

16.    Varndell is an individual limited partner of Mayflower and a citizen of and a resident in the United Kingdom.

17.    Upon information and belief, Enzo-Bio is a domestic corporation duly organized pursuant to the laws of the State of New York, having its principal place of business in New York County, State of New York.

4

18.    Upon information and belief, Enzo-Life is a domestic corporation duly organized pursuant to the laws of the State of New York, having its principal place of business in Nassau County, State of New York, and is a wholly owned subsidiary of Enzo-Bio.

## JURISDICTION AND VENUE

19.    The amount in controversy exceeds, excluding interest and costs, the sum of $75,000.00.

20.    Jurisdiction is predicated on 28 U.S.C. §1332, based on diversity of citizenship and the amount in controversy.

21.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a).

## FACTUAL ALLEGATIONS

### The $2.5 Million Earn-Out Payments.

22.    On or about May 8, 2008, Enzo and Mayflower entered into the Agreement.

23.    On or about May 8, 2008, Mayflower and the Affiniti Companies participated in the Business.

24.    On or about May 8, 2008, Mayflower directly owned all of the outstanding capital stock of Affiniti, a private limited company organized under the laws of England and Wales which in turn, directly owned all the outstanding capital stock of Affiniti Research, a private limited company incorporated under the laws of England and Wales.

25.    Under the Agreement, Mayflower sold all the capital stock of Affiniti to Buyer's U.K. Affiliate, which, upon information and belief, was a private limited company incorporated under the laws of England and Wales, and a wholly owned subsidiary of Enzo-Life.

26. Pursuant to the Agreement, Mayflower, Biofiniti, Mamhead, Zipkin, Taffer, Sheppard and Varndell sold their rights, title, and interests in and to the assets of the Business, other than the assets of the Affiniti Companies, to the Buyer's U.S. Affiliate.

27. Under Section 2.6 of the Agreement, Mayflower and Enzo agreed that Mayflower would be entitled to two Earn-Out Payments of $2.5 million each (for a maximum combined total of $5,000,000) if certain Business financial conditions were met.

28. Pursuant to Section 2.6(a)(ii) of the Agreement, Mayflower was entitled to $2.5 million from Enzo for the Second Earn-Out Period if Adjusted Business Net Sales for the Second Earn-Out Period exceeded $12,067,701.00 (such amount being equal to 112% of the Business Net Sales for Mayflower's fiscal year ended December 31, 2007, rounded to the nearest dollar) and the business EBITDA for the Second Earn-Out Period exceeded $1,900,000.00.

29. According to Section 2.6(b) of the Agreement, within seventy five days after the end of each Earn-Out Period, Enzo-Life was to calculate the Adjusted Business Net Sales, the Business Net Sales and Business EBITDA for that Earn-Out Period and deliver to Mayflower a written report setting forth in reasonable detail the amount of Adjusted Business Net Sales, Business Net Sales and Business EBITDA for that Earn-Out Period (the "Written Reports").

30. Under Section 2.6(b) of the Agreement, each Written Report delivered to Mayflower was to be accompanied by documentation appropriate to support the calculation of Adjusted Business Sales, Business Net Sales and Business EBITDA for that Earn-Out Period.

31. Under Section 2.6(b) of the Agreement, each Written Report and the accompanying backup documentation to support its calculation for each Earn-Out Period were collectively referred to in the Agreement as an "Earn-Out Statement."

6

32.     According to Section 2.6(b) of the Agreement, each Earn-Out Statement was to be used for determining whether an Earn-Out Payment was to be made to Mayflower in accordance with Section 2.6(a) of the Agreement.

33.     Under Section 2.6(b) of the Agreement, during the Earn-Out Periods, within sixty days after the end of each of Enzo-Life's fiscal quarters, Enzo-Life was to prepare and deliver to Mayflower unaudited interim statements of income for that fiscal quarter for each of Buyer's U.S. Affiliate and Buyer's U.K. Affiliate (the "Unaudited Quarterly Statements").

34.     Enzo-Life has not delivered Unaudited Quarterly Statements for the Second Earn-Out Period to Mayflower.

35.     Enzo-Life has not delivered Unaudited Quarterly Statements for the Second Earn-Out Period to Mayflower as required under Section 2.6(b) of the Agreement.

36.     Mayflower has demanded the delivery of the Unaudited Quarterly Statements from Enzo.

37.     Mayflower has demanded the delivery of the Unaudited Quarterly Statements from Enzo to no avail.

38.     Enzo is in breach of the Agreement for Enzo-Life's failure to deliver to Mayflower the Unaudited Quarterly Statements for the Second Earn-Out Period though duly demanded to do so.

39.     Under Section 2.6(e)(ii) of the Agreement, "Business Net Sales" is defined to mean:

> "[F]or the applicable Earn-Out Period, the sum of (1) the gross revenues of Buyer's U.S. Affiliate that are directly and solely attributable to the conduct of the Business or the ownership or operation of the Assets by Buyer's U.S. Affiliate excluding gross revenues attributable to (x) royalties ... (y) grants or awards from any governmental authorities and (z) intercompany sales of products or services among Buyer's U.S. Affiliate and the Affiniti Companies, and (2) the gross revenues of

7

Buyer's U.K. Affiliate that are directly and solely attributable to the conduct of the Business or the ownership or operation of the Assets by Buyer's U.K. Affiliate, including for this purpose the gross revenues of the Affiniti Companies, but excluding gross revenues attributable to (x) royalties … (y) grants or awards from any governmental authorities and (z) intercompany sales of products or services among Buyer's U.S. Affiliate and the Affiniti Companies …"

40.     Under Section 2.6(e)(i) "Adjusted Business Net Sales" is defined to mean:

"[F]or the applicable Earn-Out Period, the Business Net Sales minus the gross revenues attributable to any increase in sales price of products or services of the Business over the sales price of such products or services of the Business … as of April 30, 2009, with respect to the Second Earn-Out Period (provided that revenues attributable to (x) sales of new product lines of the Business first sold by the Business … after April 30, 2009, with respect to the Second Earn-Out Period, or (y) proportionate adjustments to sales prices necessary to maintain historical 2007 profit margins on the individual products or services (to the extent such proportionate adjustments are set forth in writing delivered to Buyer on a quarterly basis), in each case shall not be so deducted from gross revenues)."

**The Accounting Firm Determination Procedure.**

41.     Section 2.6(c) of the Agreement contains the Accounting Firm Determination Procedure in relation to the Earn-Out Payments under Section 2.6 of the Agreement.

42.     According to Section 2.6(c) of the Agreement:

"The determination of the Accounting Firm shall be limited to the disagreements submitted to the Accounting Firm and shall be limited in scope as to whether:  (i) the Earn-Out Statement was derived from the books and records of Parent [Enzo-Bio] and Buyer [Enzo-Life], in conformity with GAAP consistent with the consolidated financial statements included in the Parent SEC Reports and (ii) if there were any mathematical errors in the calculation of the Adjusted Business Net Sales, Business Net Sales and/or Business EBITDA for the Earn-Out Period."

43.     Section 2.6(c) of the Agreement also provides that:

"[U]pon resolution by the Accounting Firm to its satisfaction of all such disputed matters, the Accounting Firm shall cause to be prepared and shall deliver to Seller [Mayflower] and Buyer [Enzo-Life] a final Earn-Out Statement setting forth the Adjusted Business Net Sales, Business Net Sales and/or the Business EBITDA for the Earn-Out Period, and the date

of such delivery by the Accounting Firm shall be deemed the date on which the Earn-Out Statement and the Adjusted Business Net Sales, Business Net Sales and/or the Business EBITDA for the Earn-Out Period shall become final, binding and conclusive."

**The Overdue $2.5 Million Second Earn-Out Period Payment.**

44.     On July 14, 2010, Enzo delivered a purported second earn-out statement to Mayflower (the "Purported Second Earn-Out Statement").

45.     The Purported Second Earn-Out Statement reflected "Revenue" of $11,832,558.00 and EBITDA of $2,062,342.00 for the Second Earn-Out Period.

46.     The Purported Second Earn-Out Statement did not contain a calculation of Adjusted Business Net Sales or Business Net Sales for the Second Earn-Out Period.

47.     The Purported Second Earn-Out Statement was not accompanied by documentation appropriate to support the calculation of Adjusted Business Net Sales or Business Net Sales for the Second Earn-Out Period.

48.     By letter dated July 14, 2010 to Mayflower on behalf of Enzo, Enzo informed Mayflower that based on the Purported Second Earn-Out Statement, Mayflower was not entitled to the Second Earn-Out Payment since Adjusted Business Net Sales for the Second Earn-Out Period was $11,833,558.00 and did not exceed $12,067,701.00, as required under the terms of the Agreement.

49.     Pursuant to Section 2.6(c) of the Agreement, Mayflower had ten days after its receipt of the Purported Second Earn-Out Statement to object in writing and to specify its disagreements with it.

50.     On July 23, 2010, by Earn-Out Objection Notice dated July 23, 2010 (the "Objection Notice"), Mayflower objected to the Purported Second Earn-Out Statement and specified its objections to Enzo.

51.   In the Objection Notice, Mayflower objected, in part, as follows:

1.   In Section 2.6(b) of the Agreement, the written report delivered to Seller [Mayflower] must be accompanied by documentation appropriate to support the calculation of Adjusted Business Net Sales and Business Net Sales for such Earn-Out Period [the "Back-Up Documentation"]. Parent [Enzo-Bio] and Buyer [Enzo-Life] have not provided sufficient detail to calculate Adjusted Business Net Sales and Business Net Sales for the Second Earn-Out Period. Accompanying backup documentation as required under Section 2.6(b) of the Agreement [was] requested to specifically calculate the Adjusted Business Net Sales and Business Net Sales [the "Backup Documentation"].

2.   Under Section 2.6(b) of the Agreement, within sixty (60) days after the end of fiscal quarter of Parent and Buyer during the Earn-Out Periods, Parent and Buyer were required to prepare and deliver to Mayflower unaudited interim statements of income for such quarter for each of Buyer's U.S. Affiliate and Buyer's U.K. Affiliate. During the Second Earn-Out Period, Parent and Buyer have failed to provide the unaudited interim statements of income for each fiscal quarter as required under Section 2.6(b) of the Agreement. The required statements of income for each fiscal quarter [were] requested as required under Section 2.6(b) of the Agreement.

3.   Under Section 2.6(e)(ii) of the Agreement, the definition of Business Net Sales does not exclude sales of "non-BML products" from Buyer's U.S. Affiliate and Buyer's U.K. Affiliate, as indicated on Exhibit B of Buyer's July 14, 2010 letter. Accordingly, under Section 2.6(e)(ii) of the Agreement, Seller [requested], and Parent and Buyer [were] required, to calculate total revenue on Exhibit B of Parent and Buyer's July 14, 2010 letter to include sales of "non-BML products" from Seller locations.

4.   With respect to Exhibit B attached to Seller's July 14, 2010 letter, as required under Section 2.6(b) of the Agreement, Parent and Buyer have failed to provide, and Seller request[ed] detailed financial reports, records, books or documentation for calculation of:

A.   Unit, dollar and volume sales of 'BML products' (as referenced in Footnote A to Exhibit B, BML brand products) for the Second Earn-Out Period.

B.   Global Trade Sales of 'BML products' (as referenced in Footnote A to Exhibit B, BML brand products) ($13,009,901) post-integration.

C.   Global sales of 'non-BML products' of Mayflower for the Second Earn-Out Period.

D.  Adjustment to Global Trade Sales as a result of currency exchange rates for the Second Earn-Out Period.

E.  Adjustment to Global Trade Sales for post and pre-integration revenue ($176,761) (Footnote A).

F.  Adjustment for Revised Distributors ($146,172).

G.  Adjustment for Product Rationalization ($214,524).

H.  Adjustment for increase of Total Revenue (for the Second Earn-Out Period) attributable to "BML products" (as referenced in Footnote A to Exhibit B, BML brand products) that were eliminated from BML product lines as a result of duplication in product lines sold by Enzo-Parent and Enzo-Buyer affiliates [the documents requested in paragraphs 4A through H are referred to as the "Limited Financial Records"].

52.     Section 9.2(a) of the Agreement provides that "Each Party agrees that it will cooperate with and make available to the other Parties, during normal business hours, all Books and Records, Excluded Records, information and employees (without substantial disruption of employment) retained and remaining in existence after the Closing which are necessary and useful in connection with...any litigation or investigation or any other matter requiring such Books and Records, information or employees for any reasonable business purposes" (the "Books and Records").

53.     By Robert H. Cohen, Esq.'s ("Cohen"), Enzo's counsel, letter to Mayflower dated August 9, 2010 (the "Response Letter"), Enzo responded to the Objection Notice without providing the Back-Up Documentation, the Unaudited Quarterly Statements, or the Limited Financial Records, and unilaterally and improperly imposed conditions on Mayflower's access to the Books and Records in violation of Sections 2.6(b) and 9.2 of the Agreement.

54.     In the Objection Notice, Mayflower informed Enzo that based on the monthly financial reports provided by Enzo to Mayflower, the trade revenues of Mayflower, including freight, exceeded the target for the Second Earn-Out Period of $12,067,701; that as a result,

under Section 2.6(a)(ii) of the Agreement, Mayflower calculated that the Adjusted Business Net Sales for the Second Earn-Out Period exceeded $12,067,701, and that the Second Earn-Out Payment of $2,500,000 was due and payable to Mayflower as of July 20, 2010.

55.     In the Objection Notice, Mayflower demanded payment of the Second Earn-Out Payment in accordance with Section 2.6(d) of the Agreement.

56.     In the Response Letter, Enzo rejected Mayflower's demand for the Second Earn-Out Payment.

57.     In the Objection Notice, Mayflower notified Enzo that under Section 2.6(c) of the Agreement, Enzo was required to afford Mayflower and its representatives' reasonable access during normal business hours to the financial records of Enzo-Life to enable Mayflower's review of the Earn-Out Statement.

58.     In the Response Letter, Enzo unilaterally and improperly conditioned the access to the Books and Records Enzo were required to provide under Sections 2.6(c) and 9.2(a) of the Agreement.

59.     Enzo's failure to provide the Backup Documentation, the Unaudited Quarterly Statements and the Limited Financial Records are breaches of the Agreement.

60.     Enzo's failure to provide access to the Books and Records is a breach of the Agreement.

61.     Enzo has breached section 2.6 of the Agreement by not providing Mayflower and its representatives with reasonable access during normal business hours to the Books and Records of Enzo-Life to enable Mayflower to reasonably review the Purported Second Earn-Out Statement.

**During The Second Earn-Out Period, Enzo Failed To Act In Good Faith In Operating The Business And Engaged In Transactions The Primary Purpose Of Which Was To Avoid Making The Second $2.5 Million Earn-Out Period Payment To Mayflower.**

62.    Section 2.6(f) of the Agreement provides that "During the Earn-Out Period, Parent [Enzo-Bio] and Buyer [Enzo-Life] shall operate the Business in good faith and shall not take any actions the primary purpose of which is to avoid making the Earn-Out Payments to Seller [Mayflower]."

63.    The Objection Notice contained a Section II in which Mayflower informed Enzo specifically how, to its then knowledge, without the benefit of the financial information Enzo was required to provide Mayflower before and with the delivery of the Earn-Out Statement and without a review of the relevant books and records, during the Second Earn-Out Period, Enzo did not operate the Business in good faith, and engaged in transactions the specific purpose of which was to avoid making the Second Earn-Out Payment to Mayflower, in violation of Section 2.6(f) of the Agreement.

64.    In Section II of the Objection Notice, Mayflower listed in paragraphs A though I how during the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions, the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower.

65.    In the Response Letter, Enzo rejected Mayflower's contentions reflected in its Objection Notice, Section II, paragraphs A through I.

66.    During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower.

13

67.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by not delivering to Mayflower the Unaudited Quarterly Statements.

68.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by failing to provide the Unaudited Quarterly Statements which precluded Mayflower from having the ability to make necessary adjustments to meet the target for the Second Earn-Out Period Payment.

69.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by dismantling Mayflower's distribution network in favor of a new distribution network of an Enzo affiliate, the former Alexis Corporation.

70.     Enzo's dismantling of Mayflower's distribution network caused a negative impact on sales of Mayflower's products.

71.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by requiring Mayflower to eliminate the proprietary trade name "Biomol" from all product labels.

72.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by emphasizing Enzo's trade name, "Enzo," in Mayflower's marketing materials and on Mayflower's web site.

14

73.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by not providing sufficient notice to customers of the removal of "Biomol" from the labels of Mayflower's products, and emphasizing "Enzo" in Mayflower's marketing materials and on Mayflower's web site.

74.     Eliminating the proprietary trade name "Biomol" from all products labels, and emphasizing "Enzo" on Mayflower's marketing materials and on Mayflower's website, and failing to provide adequate notice to Mayflower's customers of these changes, caused a negative impact on the sales of Mayflower's products.

75.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by having an affiliated company market and sell "Alexis" products that were similar to certain products manufactured and sold by Mayflower.

76.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by having an affiliated company market and sell products similar to certain of those of Mayflower's under the "Alexis" brand name to the affiliate's and Mayflower's customers at prices that were often less than the prices for similar products offered by Mayflower.

77.     Enzo's directing its affiliate to market and sell "Alexis" branded products, which were similar to certain of those of Mayflower, to the affiliate's and Mayflower's customers diverted sales from Mayflower to the Enzo affiliate.

78.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by requiring Mayflower to terminate its manufacture and sale of products that were a duplication of the products available from the Enzo affiliate who sold "Alexis" branded products.

79.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by requiring Mayflower to terminate the manufacture and sale of certain products that Mayflower manufactured and sold to customers as a result of duplication of those products to those available from the Enzo affiliate which sold "Alexis" branded products, which action diverted sales from Mayflower.

80.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by not changing its affiliate's proprietary trade name of "Alexis" in conjunction with products which competed with Mayflower's products and Enzo's continuing to utilize the trade name "Alexis" for worldwide product sales with those products.

81.     The continued use by Enzo's affiliate of the trade name "Alexis" diverted sales from Mayflower to the Enzo affiliate which sold the "Alexis" branded products.

82.     During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by terminating the global sales and marketing responsibilities of Zipkin, Taffer, Sheppard and Varndell.

16

83.    When the global sales and marketing responsibilities of Zipkin, Taffer, Sheppard and Varndell were eliminated, it caused a negative impact on sales of Mayflower products.

84.    During the Second Earn-Out Period, Mayflower's website was integrated into Enzo's website.

85.    During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower, by having Enzo's website designed to support and promote "Alexis" branded products rather than Mayflower's products.

86.    The integration and design of Mayflower's website into the Enzo website caused a negative impact on sales of Mayflower products.

87.    During the Second Earn-Out Period, Enzo did not act in good faith in operating the Business, and engaged in transactions the primary purpose of which was to avoid making the Second Earn-Out Payment to Mayflower, by having product literature, catalogs and newsletters (the "Promotional Items") printed by Enzo promote "Alexis" branded products rather than Mayflower products.

88.    By having Enzo's worldwide marketing departments utilize the Promotional Items to promote sales of the "Alexis" branded products diverted sales from Mayflower to an Enzo affiliate.

## AS AND FOR A FIRST CAUSE OF ACTION

89.    Mayflower repeats and realleges each and every allegation contained in paragraphs 1 through 88 herein, with the same force and effect as though fully set forth at length herein.

17

90.     Enzo breached Section 2.6(b) of the Agreement by failing to provide to Mayflower the Back-Up Documentation with the Purported Second Earn-Out Notice.

91.     Enzo breached Section 2.6(b) of the Agreement by not providing Mayflower sufficient detail to calculate Adjusted Business Net Sales and Business Net Sales for the Second Earn-Out Period (the "Detailed Calculation") with the Purported Second Earn-Out Notice.

92.     Enzo breached Section 2.6(b) of the Agreement by not providing to Mayflower, within sixty days after the end of each fiscal quarter during the Second Earn-Out Period, the Unaudited Quarterly Statements.

93.     Enzo breached Section 2.6(b) of the Agreement by failing to provide to Mayflower the Limited Financial Information.

94.     Enzo breached Section 2.6(c) and 9.2 by failing to provide Mayflower unconditional access to the Books and Records.

95.     The Back-Up Documentation, Detailed Calculation, Unaudited Quarterly Statements and Limited Financial Information are crucial to Mayflower's preparation for the Accounting Firm Determination Proceeding.

96.     Without the Back-Up Documentation, Detailed Calculations, Unaudited Quarterly Statements and Limited Financial Records and unconditional access to the Books and Records, Mayflower will suffer irreparable harm since it will not be able to properly prepare for and participate in the Accounting Firm Determination Procedure.

97.     Mayflower has no adequate remedy at law.

98.     Mayflower respectfully requests judgment ordering and directing Enzo to deliver to Mayflower the Back Up Documentation, the Detailed Calculation, the Unaudited Quarterly Statements and the Limited Financial Records within 10 days of the clerk's entry of the Court's judgment in this case.

18

99.   Mayflower respectfully requests judgment ordering and directing Enzo to provide Mayflower unconditional access to the Books and Records within 10 days of the clerk's entry of the Court's judgment in this case.

100.   In accordance with Section 10.12 of the Agreement, Mayflower is entitled to reimbursement from Enzo for the attorneys' fees, costs and disbursements incurred by Mayflower in this action and in enforcing Mayflower's rights under the Agreement, in an amount to be determined by the Court.

## AS AND FOR A SECOND CAUSE OF ACTION

101.   Mayflower repeats and realleges each and every allegation contained in paragraphs 1 through 100 herein, with the same force and effect as though fully set forth at length herein.

102.   Pursuant to Section 2.6(f) of the Agreement, Enzo was obligated to operate the Business in good faith and not to take any actions the primary purpose of which was to avoid making the Second Earn-Out Period Payment to Mayflower.

103.   During the Second Earn-Out Period, Enzo did not operate the Business in good faith, and engaged in transactions the specific purpose of which were to avoid making the Second Earn-Out Period Payment to Mayflower, by taking, among other actions, the actions specified in paragraphs 67 through 88 of this complaint, of which Enzo was previously notified in the Objection Notice.

104.   Under Section 2.6(c) of the Agreement, if Mayflower and Enzo-Life are unable to resolve their disputes in relation to an Earn-Out Statement within thirty days of the delivery of an Earn-Out Objection Notice, then they are to request the Accounting Firm to resolve the remaining disagreements.

105.   The parties have agreed that the Accounting Firm Determination Procedure contained in Section 2.6(c) of the Agreement is separate and apart from the determination under Section 2.6(f) of the Good Faith and Primary Purpose Issues.

106.   In the Response Letter, Enzo took the position that the Accounting Firm Determination Procedure must be concluded before a determination of whether Section 2.6(f) of the Agreement has been violated.

107.   By letter dated August 24, 2010, David A. Applebaum, Esq. ("Applebaum"), Mayflower's counsel, wrote  Cohen, Enzo's counsel, and asked that "to avoid the necessity of protracted litigation to determine this timing issue, kindly confirm that the Section 2.6(f) issues should be resolved before engaging the Accounting Firm [under Section 2.6]" (the "Applebaum Letter").

108.   By letter dated September 2, 2010, Cohen, Enzo's counsel, refused to agree that the Section 2.6(f) issues be resolved before the Accounting Firm is engaged under Section 2.6(c) (the "Refusal Letter").

109.   In the Applebaum Letter, Applebaum told Cohen that if he could not commit to the timing issue, then "perhaps [Cohen] can explain how a favorable determination for Seller [Mayflower] of its Section 2.6(f) challenges - particularized in Section II, paragraphs A through I of the Breach Notice - will impact Seller's right to the Second Earn-Out Period Payment if the Section 2.6(f) determination is rendered after the Accounting Firm delivers its final, binding and conclusive determination under Section 2.6(c)."

110.   In the Refusal Letter, Cohen did not explain how a favorable determination for Mayflower of its Section 2.6(f) challenges - particularized in Section II, paragraphs A through I of the Breach Notice - will impact Mayflower's right to the Second Earn-Out Period Payment if

the Section 2.6(f) determination is rendered after the Accounting Firm delivers its final, binding and conclusive determination under Section 2.6(c).

111.    In the Refusal Letter, Cohen indicated that the Accounting Firm Determination Procedure should be pursued before the Good Faith and Primary Purpose Issues.

112.    If the Accounting Firm makes its determination prior to the Good Faith and Primary Purpose Issues being resolved, Enzo and Mayflower will be forced to repeat the Accounting Firm process with new gross revenue amounts for Buyer's U.S. Affiliate and Buyer's U.K. Affiliate - - a needlessly expensive and time-consuming exercise

113.    Since the breaches of Section 2.6(f) of the Agreement, as alleged by Mayflower, may affect the gross revenues of the U.S. Affiliate and the U.K. Affiliate for the Second Earn-Out Period, which revenues are significant parts of the Business Net Sales and Adjusted Business Net Sales calculations under Sections 2.6(e)(i) and (ii) of the Agreement, Mayflower seeks a judgment enjoining and restraining the Accounting Firm Determination Procedure under Section 2.6(c) of the Agreement until this Court provides declarations on the Good Faith and Primary Purpose Issues crystallized in and by the Purported Second Earn-Out Notice and the Objection Notice, and specifically set out in paragraphs 67 through 88 of this Complaint.

114.    Mayflower will suffer irreparable harm if the Accounting Firm Determination Procedure goes forward before a decision is made by this Court on the Good Faith and Primary Purpose Issues, which issues will decide whether there are any additional gross revenues which should have been attributed to the Buyer's U.S. Affiliate and/or Buyer's U.K. Affiliate for the Second Earn-Out Period.

115.    Mayflower has no adequate remedy at law.

116.    In accordance with Section 10.12 of the Agreement, Mayflower is entitled to reimbursement from Enzo for the attorneys' fees, costs and disbursements incurred by Mayflower in this action and in enforcing Mayflower's rights under the Agreement, in an amount to be determined by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Mayflower demands that this Court enter judgment:

A.    On its first cause of action, ordering and directing Enzo-Bio and Enzo-Life to deliver to Mayflower the Back Up Documentation, the Detailed Calculation, the Unaudited Quarterly Statements, and the Limited Financial Records, and to provide Mayflower unconditional access to the Books and Records, within 10 days of the entry of the Court's judgment in this case.

B.    On its second cause of action:

   (i)    Enjoining and restraining Enzo-Bio and Enzo-Life from pursuing the Accounting Firm Determination Procedure until ten days after the entry of judgment in this action; and,

   (ii)   Pursuant to Section 220 of the Federal Declaratory Judgment Act, declaring that Enzo-Bio and Enzo-Life failed to act in good faith in operating the Business during the Second Earn-Out Period, or took actions the primary purpose of which was to avoid paying the $2.5 million Second Earn-Out Period Payment; and,

   (iii)  Pursuant to Section 220 of the Federal Declaratory Judgment Act, deciding and declaring the amount of gross revenue, if any, which should be attributable to the Buyer's U.S. Affiliate and the Buyer's

U.K. Affiliate which were not so attributed due to Enzo-Bio and Enzo-Life's operating the Business in bad faith, or taking actions the primary purpose of which was to avoid making the Second Earn-Out Payment;

     C.     Awarding Mayflower its legal fees, costs and disbursements in this case pursuant to Section 10.12 of the Agreement; and

     D.     Awarding Mayflower such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         September 22, 2010

                             TOBIAS LAW FIRM, P.C.

                             By: _____
                                 David G. Tobias (DT-3284)
                             Counsel for Plaintiff Mayflower Partners, L.P.
                             formerly known as Biomol International, L.P.
                             600 Third Avenue, 15th Fl.
                             New York, New York 10016
                             (212) 661-5460